KEITH A. DAVIS, ESQUIRE
New Jersey Attorney # 025471999
CHRISTOPHER D'ESPOSITO, ESQUIRE
New Jersey Attorney #084192014
**NEHMAD DAVIS & GOLDSTEIN, P.C.**
4030 Ocean Heights Avenue
Egg Harbor Township, New Jersey 08234
Phone: (609) 927-1177
Fax: (609) 926-9721
kdavis@ndglegal.com / cdesposito@ndglegal.com
*Attorneys for Plaintiffs*

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| THE HANSEN FOUNDATION, INC., a New Jersey not for profit corporation; HANSEN HOUSE, LLC, a New Jersey limited liability company;<br><br>  Plaintiffs,<br><br>v.<br><br>CITY OF ATLANTIC CITY, a municipal corporation of the State of New Jersey, the ATLANTIC CITY ZONING BOARD OF ADJUSTMENT, and SHEILA Y. OLIVER, in her official capacity as Commissioner of the NEW JERSEY DEPARTMENT OF COMMUNITY AFFAIRS<br><br>  Defendants. | Civil Action No.<br><br>**VERIFIED COMPLAINT** |

Plaintiffs, The Hansen Foundation, Inc., and Hansen House, LLC, by way of Complaint against Defendants, City of Atlantic City, the Atlantic City Zoning Board of Adjustment, and the New Jersey Department of Community Affairs, hereby aver and state as follows:

**INTRODUCTION OF PARTIES**

1.     The Hansen Foundation, Inc. (the "Hansen Foundation") is a New Jersey, not for-profit, tax-exempt corporation whose primary purpose is to receive, administer, invest, and distribute

funds for charitable purposes. The Hansen Foundation's primary place of business is located at 4 E. Jimmie Leeds Road, Suite 3, Galloway Township, New Jersey 08205.

2.      Hansen House, LLC ("Hansen House") is a New Jersey limited liability corporation with a principal place of business at 4 E. Jimmie Leeds Road, Suite 3, Galloway Township, New Jersey 08025. The primary purpose of Hansen House is to provide housing and assistance to men and women in recovery from the use of drugs and alcohol, with the goal of them becoming self-sufficient, independent, and productive members of society. Hansen House was created to hold real estate that was acquired for Hansen Foundation's purposes and is a subsidiary of the Hansen Foundation ("Hansen Foundation" and "Hansen House" are referred to individually or collectively as "Hansen").

3.      Defendant, City of Atlantic City ("Atlantic City" or "City") is a municipal corporation of the State of New Jersey located within the County of Atlantic with its principal place of business at 1301 Bacharach Boulevard, Atlantic City, New Jersey 08401.

4.      Defendant, Atlantic City Zoning Board of Adjustment ("Board"), is the zoning board of adjustment of Atlantic City operating pursuant to the Municipal Land Use Law, N.J.S.A. 40A:55D-1, et seq. ("MLUL"). The Board maintains a principal place of business at 1301 Bacharach Boulevard, Suite 506, Atlantic City, New Jersey 08401.

5.      Defendant, Sheila Y. Oliver, is the Commissioner of the New Jersey Department of Community Affairs ("DCA") which is a state agency that provides administrative guidance, financial support and technical assistance to local governments, community development organizations, businesses and individuals. DCA has oversight of the City pursuant to the Municipal Stabilization and Recovery Act ("Act"). Pursuant to the Act, DCA's Local Finance Board has the right to "control[] litigation" involving the City and the City's "legal affairs," including "defending" and "resolving litigation." See N.J.S.A. 52:27BBBB-5a(3)(d).

## JURISDICTION AND VENUE

6.      This Court has subject matter jurisdiction over this action under 28 U.S.C. Sections 1331 and 1343, 42 U.S.C. Section 3613, and 42 U.S.C. Section 12133.

7.      This Court has subject matter jurisdiction over the state claims pursuant to 28 U.S.C. Section 1367.

8.      Declaratory and injunctive relief is sought pursuant to 28 U.S.C. Section 2201, 42 U.S.C. Section 3613(c)(1) and 42 U.S.C. Section 12133, as well as Rules 57 and 65 of the Federal Rules of Civil Procedure.

9.      Venue is proper in the United States District Court for the District of New Jersey as all acts complained of occurred within this District.

## OPERATIVE FACTS

### DCA Adopts Regulations Concerning Cooperative Sober Living Residences

10.     Effective January 16, 2018, DCA adopted rooming and boarding house regulations which established "Cooperative Sober Living Residences," which are commonly referred to as CSLRs (the "Regulations").

11.     The Regulations define a "Cooperative Sober Living Residence" as a "<u>residential</u> setting that serves solely as a <u>home</u> for individuals who are recovering from drug or alcohol addiction and intended to provide an environment where the residents can support each other's sobriety and recovery.". A true and accurate copy of N.J.A.C. 5:27-2.1 is attached hereto and made a part hereof as **<u>Exhibit A</u>**.

12.     The Regulations require all CSLRs to obtain a Class F license from DCA. N.J.A.C. 5:27-1.6.

13.     Under the Regulations, all CSLRs shall abide by the following conditions:

1. Management by an entity or organization that provides an operator who shall reside in the residence and exercise some level of control over the operation of the residence and establishes the residence's rules;

2. Occupancy shall not exceed 10 individuals, exclusive of the operator;

3. The requirement of the maintenance of an alcohol and drug free environment;

4. No provision of on-site counseling, therapy, clinical treatment, or alcohol and/or drug treatment by the licensee;

5. No provision of food, laundry, financial, or other personal services by the licensee;

6. Ability of licensee, at its discretion, to provide non-clinical recovery and support services. The licensee may also elect to mandate or encourage residents to attend self-help recovery programs, participate in activities related to maintaining sobriety and continuing recovery, or receive off-site services deemed desirable or necessary to maintain sobriety; and

7. Ability of licensee, at its discretion, to require drug or alcohol testing of residents.

[See **Exhibit A**].

14.      In adopting the Class F license for CSLRs, DCA recognized CSLRs "fill an important niche and serve a laudable public purpose" and thus should be "encouraged." 49 N.J.R. 1276.

15.      Pursuant to N.J.A.C. 5:23-3.11 (k), DCA "shall be the sole enforcing agency for Cooperative Sober Living Residences licensed as Class F rooming houses."

## The Home

16.      Hansen owns the real property located at 16 S. Tallahassee Avenue in the City ("Property"). The Property is shown and designated on the City's Tax Map as Block 210, Lot 3.

17.      The Property is improved with an existing four-story single-family detached dwelling with an attached garage and a concrete driveway (the "Home"). A true and accurate photograph of the Home is attached hereto and made a part hereof as **Exhibit B**.

18.      Since May 2019, Hansen has used the Home as a single-family residence for disabled women in recovery from alcohol and drug use to reside together as the functional equivalent of a family.

## The Home is Situated Within the City's R-2 Single-Family Detached Residential District

19.      The City Council of the City of Atlantic City adopted the Code of the City of Atlantic City ("Code"). See Code Section 1-1.[1]

20.      Chapter 163 of the Code is known as the "Atlantic City Land Use Ordinance" ("Zoning Ordinance" or "Ordinance"). See Code Section 163-1.

21.      The Ordinance divides the City into approximately twenty three zoning districts, including the R-2 Single-Family Detached Residential District ("R-2 Zone"). See Code Section 163-52.

22.      The Home is situated in the R-2 Zone.

23.      "Single-family detached dwellings" are principal permitted uses in the R-2 Zone. See Code Section 163-55B.

24.      A "Single-family Detached Dwelling" is "[a] dwelling designed for and occupied by not more than one family or group family household and surrounded by open space or yards and having no roof, wall or floor in common with any other dwelling unit." See Code Section 163-15B.

---

[1] The Code is accessible to the public via the following url: https://ecode360.com/15217925

4

25.   The term "Family" is defined by the Code as "[o]ne or more persons related by blood, marriage, adoption or guardianship, or not more than three persons not so related, occupying a dwelling unit and living as a single housekeeping unit." See Code Section 163-15B.

26.   The term "single housekeeping unit" is not defined by the Code.

27.   Code Section 163-66 governs "Group Family Households."

28.   A "group family household" is a "group of four or more persons, not constituting a family as defined in [Code Section 163-15], living together in a dwelling unit as a single housekeeping unit, under a common housekeeping management based on an intentionally structured relationship of mutual responsibility and providing an organization and stability essentially equivalent to that found in families based on relationships of marriage and blood." See Code Section 163-66(c)(1).

29.   Code Section 163-66(c)(1) includes 10 factors to be considered by the City's Land Use Administrator in determining whether a group constitutes a group family household.

30.   Code Section 163-66(c)(1) further states that in determining whether a group constitutes a group family household, the Land Use Administrator shall consider all facts and circumstances, and the presence or absence, in whole or in part, of any particular factor shall not be deemed controlling.

31.   Group family households are permitted in all zones in the City, except for the R-1 or R-2 Zones.

### The Code Violates Longstanding New Jersey Supreme Court Precedent

32.   The first clause of the Code's definition of "family" is unconstitutional under the New Jersey Constitution as it defines family based upon legal affiliation. See Berger v. State, 71 N.J. 206, 223-24 (1976) (holding ordinances defining a 'family' as persons related by "blood, marriage or adoption" violate due process and "must fall" because they too narrowly limit "the persons who may occupy a single-family dwelling").

33.   The second clause of the Code's definition of "family" is unconstitutional under the New Jersey Constitution because it imposes a numerical limitation. See State v. Baker, 81 N.J. 99, 113-14 (1979) (holding a zoning regulation which defines "family" based upon "the number of unrelated individuals" in a "single non-profit housekeeping unit" does not "pass constitutional muster").

34.   The Code's definition of a group family household is unconstitutional as it necessarily requires a finding that a group is not a "family." See Code Section 163-66(c)(1).

35.   The Code's definition of "family" is unconstitutional under New Jersey law as the term "single-housekeeping unit" is not defined in the Code. See Cherry Hill Twp. v. Oxford House,

Inc., 263 N.J. Super. 25, 45 (App. Div. 1993) (recognizing a definition of family in a zoning ordinance which lacks a functional standard defining a single housekeeping unit which is "capable of being met by either related or unrelated persons" does "not pass constitutional muster") (citing Borough of Glassboro v. Vallorosi, 117 N.J. 421, 431 (1990)).

### Hansen Begins Using the Home as a Sober Living Home

36.    On or about March 29, 2019, Hansen purchased the Property and the Home is commonly referred to as the "Serenity House."

37.    On or about May 31, 2019, fourteen individuals in recovery from drugs and alcohol were residing in a sober living home operated by Hansen. The residents were required to vacate that home and were in imminent danger of being homeless. Rather than allow the disabled residents to become displaced and risk relapse, Hansen relocated them to the Home.

38.    The residents reside in the Home under a supervised sober living program adopted by Hansen which provides a higher level of structure and assistance than other sober living models.

39.    The Home is not a licensed treatment facility, but rather the equivalent of a single-family residence where disabled residents live together as a single-housekeeping unit.

40.    The residents sign a contract to reside at the Home and abide by strict rules.

41.    The residents live in the Home as a family. A typical day at the Home consists of the residents arising, going to work, coming home, cooking dinner, and going to "12 step meetings." The residents also eat together, shop together, watch television together and provide each other with emotional support as does any family.

42.    The Home provides support and structure and is necessary to allow the disabled residents to reside in a residential neighborhood and to prevent them from failing at recovery.

### The City Ignores Hansen's Request for a Reasonable Accommodation

43.    On March 7, 2019, the City notified Hansen that it allegedly violated Code Section 194-1(B) which provides, in relevant part, that "[t]he owner of any residential property shall obtain an occupancy permit prior to the sale of such property involving a new occupancy of any unit of dwelling space." A true and accurate copy of the March 7, 2019 notice is attached hereto and made a part hereof as **Exhibit C.**

44.    On July 1, 2019 the City's Director of Licensing and Inspections, Dale Finch, sent a stop construction order to Hansen concerning the installation of a HVAC system at the Home. A true and accurate copy of that order is attached hereto and made a part hereof as **Exhibit D.**

45.    On July 10, 2019, Hansen, through its counsel, sent a letter to the City's Building and Subcode Official, Anthony Cox, which explains the Home was a "single-family residence" occupied

by recovering alcoholics and drug users who support each other in recovery. A true and accurate copy of the July 10th letter is attached hereto and made a part hereof as **Exhibit E.**

46.     The July 10 letter further states that if the City was not inclined to treat the Home as a single-family residence, then a reasonable accommodation must be granted in the form of a waiver or modification of the City's ordinances and a certificate of occupancy must be granted.

47.     The July 10th letter further states that if the City did not issue the requisite approvals for the Home, then the City faced liability under federal and state anti-discrimination laws.

48.     The City did not respond to Hansen's request for a reasonable accommodation.

### The City Cites Hansen and Denies Hansen's Application for Certificate of Land Use Compliance

49.     On July 15, 2019, the City's Zoning Official, Clinton O. Walden ("Zoning Official"), cited Hansen House for failing to obtain an occupancy permit in violation of Code Section 194-1B ("Citation"). A true and accurate copy of the Citation is attached hereto and made a part hereof as **Exhibit F.**

50.     On July 18, 2019, Hansen House applied for a certificate of land use compliance ("CLUC") to use the Home as a "single family home." A CLUC in other municipalities is referred to as a zoning permit.  See N.J.S.A. 40:55D-7.  A true and accurate copy of the CLUC application which was accompanied by the July 10th letter is attached hereto and made a part hereof as **Exhibit G.**

51.     Pursuant to Code Sections 163-207 to -213, a CLUC authorizes the preparation, filing and processing of applications for any additional permits and approvals which may be required by the codes and ordinances of the City, including but not limited to a building permit, a certificate of occupancy and any special permits or approvals.

52.     On or about July 18, 2019, Hansen House received a letter from the City's Director of Licensing and Inspections which stated the Home was being "occupied and used as a residential group/community residence, in violation of Section 152-1 of the City Code of the City of Atlantic City which prohibits installing a community residence within 660 linear feet of an existing community residence."

53.     The City's Director of Licensing and Inspections further demanded that Hansen "take immediate action to vacate the property and relocated [sic] the occupants." A true and accurate copy of the July 18th letter is attached hereto and made a part hereof as **Exhibit H**.

54.     On July 19, 2019, the City denied Hansen's application for a CLUC. See **Exhibit G.**

55.     On July 31, 2019, the City's Director of Planning and Development, Barbara Woolley-Dillon, who previously served as the City's zoning officer, affirmed the denial of the CLUC. See **Exhibit G.**

56.    The denial of the CLUC contained a handwritten note which states the Home was "located within 660 linear feet of another facility that will house persons with disabilities" which "violates Section 152-1F of the City's Code." See **Exhibit G.**

57.    The denial of the CLUL further states Hansen's application had "[n]o size or # bedrooms" and "no survey showing adequate off-street parking." See **Exhibit G.**

58.    On information and belief, the City does not require the above materials to be provided when an individual applies for CLUC for a single-family home occupied by a "traditional" family related by blood or marriage.

59.    On August 16, 2019, Hansen's representative, Jennifer Hansen, and Hansen's legal counsel, Keith A. Davis, Esquire, met with Ms. Wooley-Dillon, Michael Perugini, Esquire, Catherine Ward, Esquire, and the Director of Licensing, to discuss the City's inaccurate categorization of the Home as a community residence pursuant to Code Section 152-1.

60.    During the August 16th meeting, Ms. Woolley-Dillon delivered the denial of the CLUC to Hansen. See **Exhibit G.**

61.    During the August 16th meeting, it was discussed and agreed that Hansen should proceed to apply for a new CLUC as a "group family household" under Section 163-66 of the Code.

62.    On August 30, 2019, Hansen, through its legal counsel, filed an appeal of the denial of the CLUC pursuant to N.J.S.A. 40:55D-72a with the Board. A true and accurate copy of that appeal is attached hereto and made a part hereof as **Exhibit I.**

63.    On September 5, 2019, Hansen, through its counsel, supplemented its appeal to explain the Code unlawfully restricted group family households by relegating them to districts outside of the R-1 and R-2 Zones. The September 5th letter also attached another copy of the July 11th letter requesting a reasonable accommodation. A true and accurate copy of the September 5th letter is attached hereto and made a part hereof as **Exhibit J**.

64.    The September 5th letter further states, in relevant part, as follows: "[f]ollowing our discussion with City officials, it was decided that [Hansen] should proceed to apply for a new Certification of Land Use Compliance as a group family household and anticipate doing so. We certainly recognized that the City's Ordinance restricts group family households to those residential zoning districts out of the R-1 and R-2 zones (this property is in the R-2 Zone), but understood that a reasonable accommodation would be afforded to this use in light of the pertinent state and federal caselaw that protects the residents in this home." See **Exhibit J.**

65.    On September 24, 2019, Hansen's counsel received an email and letter from Ms. Woolley-Dillon indicating the City would not consider a reasonable accommodation with respect to a group family household in the R-2 Zone or any other use unpermitted in that zone. A copy of the September 24, 2019 email and letter are collectively attached hereto as **Exhibit K.**

66.     Ms. Woolley-Dillon's letter states she believed the appeal was incomplete and she summarily determined that the time for filing an appeal had expired. See **Exhibit K.**

### Hansen Files Suit Against the City and Prevails In Part

67.     On September 26, 2019, Hansen filed suit in the Superior Court of New Jersey, Law Division against the City for its discriminatory actions toward Hansen and the disabled women who sought to live together in the Home as a family. A true and accurate copy of that suit, excluding exhibits, is attached hereto and made a part hereof as **Exhibit L**.

68.     Hansen raised facial and as applied challenges to Code Sections 152-1 and 13-66B pursuant to the Fair Housing Act, the Rehabilitation Act, the Americans with Disabilities Act, 42 U.S.C. Section 1983, the Fourteenth Amendment of the United States Constitution, the New Jersey Law Against Discrimination, and the New Jersey Civil Rights Act.

69.     On or about October 2, 2019, the City removed the case to the District of New Jersey.

70.     On December 3, 2020, the Honorable Noel L. Hillman granted in part and denied in part Hansen's motion for summary judgment and the City's cross-motion for summary judgment.

71.     Judge Hillman enjoined the City from enforcing the discriminatory 660 foot distance limitation concerning community residences in Code Section 152-1 and remanded Hansen's sole remaining LAD claim to state court for additional proceedings. A true and accurate copy of Judge Hillman's decision is attached hereto and made a part hereof as **Exhibit M.**

72.     Hansen's LAD claim remains pending in the Superior Court of New Jersey under Docket Number ATL-L-2559-19.

### The City Again Denies Hansen's Application for a CLUC

73.     On or about November 12, 2019, Hansen was issued a Class F License from DCA to use the Home as a CSLR. A true and accurate copy of the November 2019 license is attached hereto and made a part hereof as **Exhibit N.**

74.     Following Judge Hillman's decision on December 3, 2020, Hansen submitted another CLUC application to the Zoning Official on December 23, 2020. A true and accurate copy of the cover letter to the December 23, 2020 application is attached hereto and made a part hereof as **Exhibit O**.

75.     Hansen sought a CLUC to use the Home as a single-family residence for disabled individuals in recovery from alcohol and substance abuse living together as a single housekeeping unit.

76.     In support of the CLUC application, Hansen attached a copy of its CSLR license and a letter[2] addressed to Hansen by DCA's Chief of the Bureau of Rooming and Boarding House Standards which recognizes that residents of CSLRs, such as the Home, are a "single housekeeping unit." See Code Section 163-15 (defining "family" as persons occupying a dwelling as a "single housekeeping unit").

77.     Hansen's CLUC application further noted that the City had previously determined the Home was a "community residence" and the sole basis for denying a CLUC to use the Home as a "community residence" (that is, the 660 foot distance limitation) had been struck down.

78.     On or about January 8, 2021, the Zoning Officer denied the CLUC application. A true and accurate copy of the January 8th denial ("Denial") is attached hereto and made a part hereof as **Exhibit P.**

79.     In the Denial, the Zoning Officer alleged the CLUC application was deficient.

80.     In the Denial, the Zoning Officer wrote he was "unable to render a decision in the affirmative" for the proposed use of the Home as a "single-family residence for disabled individuals in recovery from alcohol and substance abuse living together as a single housekeeping unit."

81.     In relevant part, the Zoning Officer wrote in the Denial the following: "Per the DCA, a CSLR is a Group R-3 or Group R-5 occupancy. The 16 S. Tallahassee location [the Home] is situated in a R-2 zone and therefore is not a permitted use. This use requires the request and issuance of a zoning variance before being allowed to operate in an R-2 Zone."

82.     Group R-3 and Group R-5 are building code designations, not zoning code designations, which demonstrates the Zoning Officer confused building code and zoning code designations.

## Hansen Appeals the Denial of the CLUC

83.     On January 27, 2021, Hansen submitted an application to the Board which appealed the denial of the CLUC pursuant to N.J.S.A. 40:55D-72a, requested an interpretation pursuant to N.J.S.A. 40:55D-70b, and requested use variance relief pursuant to N.J.S.A. 40:55D-70(d)(1). All of this relief was sought in the alternative, meaning that the Board could grant any one of the three requested forms of relief to extend a reasonable accommodation to Hansen. A true and accurate copy of the cover letter to the Application is attached hereto and made a part hereof as **Exhibit Q.**

84.     On February 22, 2021, separate application packages addressed to the individual members of the Board were hand-delivered ("Application"). A true and accurate copy of the letter sent to the Board is attached hereto as **Exhibit R.**

85.     In the Application, Hansen requested a reasonable accommodation pursuant to federal law "to be treated a single-family use, and its residents as a functional family."

---

[2] A true and accurate copy of this letter is included in **Exhibit V** infra.

86.  Specifically, Hansen's Application sought a reversal of the Zoning Officer's decision to the deny the CLUC and/or a favorable interpretation that (a) the Home is a principal permitted use in the R-2 Zone as single-family detached dwelling; or (b) the Home meets all of the criteria of a community residence under Section 152-1 and neither the Code nor the Ordinance restrict the zoning districts in which community residences may be located. In the alternative, the Application sought use variance relief to allow for the use of the Home as a group family household, a CSLR, or any other zoning designation the Board decided to apply to the Home so long as the residents were permitted to continue to reside therein as a family.

87.  Hansen responded to each of the alleged deficiencies in the Denial demonstrating that the Zoning Officer's denial was legally incorrect. See **Exhibit R.**

## **Hansen's Application is Deemed Complete as a Matter of Law**

88.  The Board failed to exercise its statutory duty to review the Application for completeness, which was legally required to be completed within 45 days of its submission. See N.J.S.A. 40:55D-10.3.

89.  On April 28, 2021, Hansen, through its counsel, sent a letter to the Board's secretary informing her the Application had been deemed automatically complete and there was a 120-day window in which the Board was statutorily required to act pursuant to the MLUL. A true and accurate copy of the April 28th letter is attached hereto and made a part hereof as **Exhibit S**.

90.  On June 18, 2021, Ms. Woolley-Dillon sent a letter to our firm, in response to the April 28th letter, which asked for additional items and information. A true and accurate copy of the June 18th letter is attached hereto and made a part hereof as **Exhibit T.**

91.  On June 22, 2021, Hansen's counsel sent a letter to Ms. Woolley-Dillon indicating that the information she requested would be addressed at the meetings through testimony and requesting a waiver from the items identified in her June 18, 2021 letter. A true and accurate copy of the June 22nd letter is attached hereto and made a part hereof as **Exhibit U.**

## **The Meetings**

92.  On June 23, 2021, the Honorable Julio L. Mendez, A.J.S.C. entered an order in Docket Number ATL-L-2559-19 which ordered the City to coordinate with the Board to ensure the Application was considered within 120 days as mandated by the MLUL.

93.  The Board held three meetings on the application on the following dates: July 13, 2021, July 27, 2021, August 26, 2021 (collectively, the "Meetings").

94.  The Meetings were held virtually on Zoom as a result of the COVID-19 Pandemic.

95.   The July 13th meeting lasted approximately 45 minutes and ended prematurely because the City and the Board had not secured the requisite software to accommodate the large number of individuals who were trying to watch the meeting online.

96.   Over the course of the Meetings, the Applicant presented several witnesses, including Ms. Hansen, a licensed clinical drug and alcohol counselor, a resident of the Home, and expert witnesses in the fields of building and zoning code compliance and professional planning.

97.   Hansen submitted, marked, and introduced the following Exhibits over the course of the Meetings:

| | |
|---|---|
| A-01 | Applicant's Exhibit List (1 Page) |
| A-02 | Application Cover Letter (8 pages) |
| A-03 | Photograph of House   (1 photo) |
| A-04 | Cooperative Sober Living Residence License for 16 S. Tallahassee Ave. (2 pages) |
| A-05 | Property Survey (1 sheet) |
| A-06 | Architectural Floor Plans (2 sheets) |
| A-07 | Application for a Certificate of Land Use Compliance ("CLUC") (78 pages) |
| A-08 | January 8, 2021 Denial Letter from Zoning Official Clinton Walden (3 pages) |
| A-09 | Photos of Existing Parking Configuration (5 photos) |
| A-10 | Hansen House's Certificate of Formation and the 501(c)(3) tax exemption   recognition letter from the U.S. Department of Treasury |

True and accurate copies of these Exhibits are attached hereto and made a part hereof as **Exhibit V.**

### The July 13th Hearing and the Disqualification of Board Member Cara Kurtz

98.   On July 13, 2021, Hansen appeared before the Board during a virtual meeting.

99.   Prior to the hearing, Hansen's counsel learned that a member of the Board, Cara Kurtz, was married to an elected official in Atlantic City, 6th Ward Councilman Jesse O. Kurtz, who made public comments which were critical of CSLRs being located in the City.

100. On July 7, 2021, Hansen's counsel emailed the Board's attorney, John Scott Abbott, Esq., and advised him that Mrs. Kurtz should be disqualified from hearing Hansen's application.

101. Prior to the conclusion of the July 13th hearing, Hansen's counsel advised Mr. Abbott that Mrs. Kurtz had a conflict of interest because of her personal relationship to Councilman Kurtz and her conflict of interest would jeopardize any approval on appeal.

102. Mr. Abbott recommended to Mrs. Kurtz during the meeting that she recuse herself.

103. Mrs. Kurtz responded during the meeting that she did not believe there was a conflict of interest and would not be disqualifying herself from considering Hansen's application.

104. Hansen thereafter filed a Verified Complaint and Order to Show Cause in the Atlantic County Vicinage of the Superior Court of New Jersey (ATL-L-2264-21) which sought to disqualify Mrs. Kurtz from considering the Application as a member of the Board.

105. The Verified Complaint and Order to Show Cause were dismissed by the parties' stipulation after Mrs. Kurtz voluntarily elected to disqualify herself from considering the Application.

### **Jennifer Hansen**

106. Over the course of the Meetings, Jennifer Hansen testified before the Board in support of the Application.

107. Ms. Hansen testified she is the Present of the Hansen Foundation and that Hansen House is a subsidiary of the Foundation.

108. Ms. Hansen testified that Hansen House owns and operates licensed Cooperative Sober Living Residences in several municipalities in Atlantic County, including Atlantic City, Ventnor City, the City of Somers Point, and the City of Absecon.

109. Ms. Hansen testified that Hansen House is a non-profit tax-exempt entity and that no profits were derived from the CSLRs. She explained the CSLRs, including the Home, operate at a loss and are subsidized with other fundraising efforts.

110. Ms. Hansen described the crisis and epidemic of substance use which is plaguing New Jersey and the men and women who are addicted to alcohol and drugs.

111. Ms. Hansen shared her personal struggle with addiction and described how she achieved sobriety by residing in sober living homes in California. However, upon returning to New Jersey, Ms. Hansen noticed that individuals in recovery had nowhere to live after they completed treatment. Ms. Hansen explained that Hansen's mission was to help solve that void by allowing men and women in recovery to reside in sober living homes.

112.   Ms. Hansen explained the Home consisted of seven bedrooms and was occupied by 10 women in recovery from drugs and alcohol who are overseen "24/7" by staff.

113.   Ms. Hansen elaborated the driveway of the Home accommodated three vehicles and the City had issued two parking passes for off-street parking. See **Exhibit V at A-09**.

114.   Ms. Hansen testified the Home adhered to all of the Regulations, including not providing treatment services in the Home.

115.   Ms. Hansen explained CSLRs are preferable to other sober living arrangements which lack the oversight, structure, and supervision mandated by the Regulations.

116.   Ms. Hansen testified residents are required to obtain a job or go to school; the New Jersey Division of Child Protection and Permanency allows children to sleep at the Home with their mother up to three nights a week; and if a resident relapses, she is removed from the Home, taken to a safe place, and an emergency contact is notified.

117.   Ms. Hansen explained each resident pays a $180 Program Fee per week which covers all living expenses, including residency in the Home, household expenses, and staff wages.

118.   Ms. Hansen explained there was a tremendous demand for sober living homes in and around the City and that such demand is greater for women than men. Ms. Hansen further explained that Hansen has to turn away women on a nearly daily basis.

119.   Ms. Hansen noted that neighbors of the Home had been provided with Hansen's contact information and were encouraged to call at any time if there was a concern about the Home.

120.   Ms. Hansen explained that shore neighborhoods, such as the City, are a preferable location for CSLRs rather than rural areas because they are desirable places to live in residential settings and cities have public transportation and available jobs.

121.   Ms. Hansen testified the typical residency in the Home is 6 months to 12 months and the risk of relapse decreases the longer a resident resides in the Home.

**Lisa Cordasco**

122.   Lisa Cordasco testified in support of the Application.

123.   Mrs. Cordasco is a licensed clinical social worker, a licensed clinical drug and alcohol counselor, a certified Clinical Trauma Professional, and a certified Clinical Supervisor. She is also the Clinical Director at Enlightened Solutions, which maintains a drug and alcohol detoxification center in the City and an outpatient substance use disorder treatment center in Ventor City.

124.   Ms. Cordasco emphasized New Jersey has an addition crisis which is escalating in severity.

125.   Ms. Cordasco explained the Home is composed of all women which is a critically needed service as women in recovery oftentimes face difficulties obtaining treatment because addiction is commonly viewed as a "male disease. "

126.   Ms. Cordasco explained that individuals who move into CSLRs, such as the women residing in the Home, typically have a minimum of 30 days of sobriety. Ms. Cordasco elaborated these women need the ongoing support provided by the Home to create behavioral change and that long-term sobriety drastically decreased incidences of relapse.

127.   Ms. Cordaso explained that sober living homes, such as the Home, offer a "bridge" where women in recovery can continue to maintain their sobriety after their initial treatment rather than returning to their prior living arrangements where they were using drugs or alcohol. She further testified that residents maintain sobriety by residing in a safe and structured setting with other women in recovery and this living arrangement provides accountability, mentoring, and a support system.

128.   Ms. Cordasco opined the number of women residing in the Home was appropriate and therapeutically beneficial.

129.   Ms. Cordaso explained that the Home's house manager and staff provide oversite and a degree of accountability that is superior to other sober living models and that the overall goal is to acclimate the residents to living independently in a residential community.

130.   Ms. Cordasco explained the Home offers a family living environment which has therapeutic benefit to the residents and fosters continued sobriety.

131.   Ms. Cordaso elaborated that the residents are the functional equivalent of a family and they help each other to practice healthy boundaries and communication.

### **Nickole Green**

132.   Nickole Green testified in support of the Application.

133.   Ms. Green testified that she is employed by Hansen as the house manager of the Serenity Estates House, which is a licensed CSLR located on Seedorf Avenue in Atlantic City.

134.   Ms. Green testified that she has been in recovery for ten years.

135.   Ms. Green explained that CSLRs, including the Home, offer "a community within a community" where women in the earlier stages of recovery are guided by "senior" residents who understand the challenges and difficulties associated with maintaining recovery.

136.    Ms. Green explained the residents are family; they eat dinner together, show each other how to live sober lifestyles, share transportation, attend recovery meetings, work on employment skills such as resume writing, and abide by a common set of rules including a curfew.

137.    Ms. Green elaborated that this family living arrangement and mentorship also helps overcome the guilt and stigma associated with being an addict and thus fosters sobriety.

138.    Drawing on her personal and professional experience, Ms. Green explained to the Board that the family environment offered by CSLRs, including the Home, is essential to recovery and an individual cannot effectively stay clean or sober on his or her own.

### Amy Adams

139.    Ms. Adams testified in support of the Application.

140.    At the time of the meeting, Ms. Adams was a resident of the Home.

141.    Ms. Adams appeared virtually at the Hearing and testified that she was accompanied by her family, i.e., the other women who reside at the Home. A true and accurate screenshot of Ms. Adams appearing with her family is attached hereto and made a part hereof as **Exhibit W.**

142.    Ms. Adams explained to the Board that she had maintained recovery for nearly a year and had resided in the Home for approximately eleven months.

143.    Ms. Adams explained that her fellow residents in the Home are her family as they share household chores, eat meals together, watch TV, and assist each other on a daily basis.

144.    Ms. Adams advised the Board that the family living environment in the Home has been instrumental in her continued recovery as it provides structure, support, direction, and safety.

### Patrick Malia

145.    Patrick Malia testified in support of the Application and was recognized to be an expert in the enforcement of construction, building, and zoning codes.

146.    Mr. Malia was previously employed by the City as a senior building inspector and a construction official.

147.    Mr. Malia opined the Zoning Officer improperly denied the CLUC by conflating use group designations in the Uniform Construction Code ("UCC") with zoning classifications.

148.    Mr. Malia noted DCA has exclusive regulatory oversight of CSLRs pursuant to N.J.A.C. 5:23-3.11(k) and thus once a license was issued by DCA for the Home to be operated as a CSLR, all items regulated by the UCC must be enforced by DCA rather than the City.

149. Mr. Malia also noted that DCA had oversight over the City pursuant to the Act.

150. Mr. Malia noted that CSLRs must be established in one- or two-family dwellings and there is no requirement to obtain a new Certificate of Occupancy ("CO") for CSLRs. A true and accurate excerpt from the Construction Code Communicator, Volume 30, Number 2, Summer 2018 is attached hereto and made a part hereof as **Exhibit X.**

151. Mr. Malia explained that DCA's issuance of a Class F license to Hansen to use the Home as a CSLR did not change the use group of the structure, which remained a single-family dwelling for purposes of the UCC.

152. Mr. Malia further noted the City lacked jurisdiction to require Hansen to obtain a new CO for the Home as COs are mandated by the UCC and DCA is the sole enforcing agency of the UCC as it relates to CSLRs, such as the Home.

153. Recognizing the residents of the Home were afforded protections under the Fair Housing Act and related federal and state legislation, Mr. Malia noted the Board could grant a reasonable accommodation in one of three ways: (a) overturning the Zoning Officer's erroneous decision to deny the CLUC; (b) offering a favorable interpretation that the Home is a permitted use as a single family detached dwelling or a community residence; or (c) issuing a use variance to allow the Home to be utilized as a CSLR, a group family household, or whichever zoning designation the Board decided to apply to the Home.

154. Mr. Malia opined the issuance of a Class F License for the Home did not change the character of the single-family use to something other than a single-family use from a zoning perspective.

155. Mr. Malia opined the Home was a single-family detached dwelling, which is a principal permitted use in the R-2 Zone, because the residents were a single housekeeping unit with a degree of organization and stability akin to a traditional family related by blood or marriage.

156. Mr. Malia further noted that single-family homes in the R-2 Zone require only one off-street parking space under the Ordinance and the Home complied with that requirement.

157. Mr. Malia noted the Board could find that the Home was being used as community residence under Code Section 152-1, because the Home complied with all of the Code's requirements for community residences and such residences are permitted uses in the R-2 Zone.

158. Mr. Malia further opined the residents of the Home met all of the Code's requirements for "group family households" and there was no rational reason why the Code prohibited group family households from the R-2 Zone, such that use variance relief was appropriate.

### Stuart Wiser

159. Over the course of the Meetings, Stuart Wiser testified in support of the Application.

160. Mr. Wiser was accepted as an expert in professional planning and he is a professional planner licensed in New Jersey and a member of the American Institute of Certified Planners.

161. Prior to being designated as a planner for a number of land use boards in several counties, Mr. Wiser worked in the City's Planning Department from March 1999 to December 2001.

162. Recognizing the residents of the Home were afforded protections under the Fair Housing Act and related federal and state civil rights legislation, Mr. Wiser noted the Board could grant a reasonable accommodation in one of three ways: (a) overturning the Zoning Officer's erroneous decision to deny a CLUC; (b) offering a favorable interpretation that the Home is permitted use as a single family detached dwelling or a community residence; or (c) issuing a use variance to allow the Home to be utilized by a group family household or other use.

163. Mr. Wiser opined the Home met the Code's definitions of a single-family dwelling or a community residence for disabled individuals and the Home should be interpreted as such.

164. Mr. Wiser further testified the Home was an inherently beneficial use which is favored by law and that Hansen satisfied the four-part test for evaluating compliance with the negative criteria for inherently beneficial uses, as adopted by the New Jersey Supreme Court in Sica v. Bd of Adjustment of Twp. of Wall, 127 N.J. 152, 165-66 (1992).

165. Mr. Wiser explained the Home was an inherently beneficial use because sober living arrangements assist men and women in recovery and help address the epidemic of addiction.

166. Mr. Wiser further opined that even if the Home was not determined to be an inherently beneficial use, then a use variance should be granted under traditional use variance criteria.

167. Mr. Wiser noted the Home advanced several purposes of zoning, including the use of land to promote the public health, safety, and welfare and the appropriate location of residential uses. See N.J.S.A. 40:55D-2(a), (g).

168. Mr. Wiser testified the negative criteria for a use variance had been satisfied because (a) the Home is a single-family home in a zoning district which permits single family homes; (b) the Home was indistinguishable from a traditional family living environment in a single family home where the occupants are related to each other by blood or marriage; (c) the Home was consistent with the City's Master Plan which recommends housing for persons recovering from addictions without zoning district limitations; and (d) there are no detrimental effects that are unique to a CSLR that would be different from a traditional single-family home.

169. Mr. Wiser noted that Hansen would agree to any reasonable conditions that were deemed to be necessary to ameliorate any perceived detriments identified by the Board, though he concluded there were no such detriments.

## John Hess Testifies in Opposition to the Application

170. John Hess testified that he is a licensed professional planner and a licensed professional engineer who reviewed the Application at the request of the Board's professionals.

171. Mr. Hess opined the Home was not permitted in the R-2 Zone because it was a group family household. See Code Section 163-66B.

172. Mr. Hess stated the Home was not a single family detached dwelling because the residents were not a "family." More specifically, he testified the residents were not a family because under the Code's definition of "family," a family is "limited to three nonrelated members."

173. Mr. Hess admitted he had not researched whether the Code's definition of "family" comported with the New Jersey Constitution.

174. When asked if the Ordinance prohibited community residences in the R-2 Zone, Mr. Hess responded that the only prohibition was his belief that the Home was a group family household which is not a permitted use in the R-2 Zone. See Code Section 163-66B.

## Barbara Woolley-Dillon

175. Over the course of the Meetings, Ms. Woolley-Dillon testified in opposition to the Application and was cross-examined.

176. Ms. Woolley-Dillon testified the Application was substantively deficient and she claimed the Zoning Officer had denied the CLUC application submitted in December 2020 on that basis.

177. Ms. Wooley-Dillon opined Hansen failed to meet its burden to obtain a use variance.

178. Ms. Woolley-Dillon claimed that sober living arrangements had reached a "tipping point" in and around the City and thus the Home should not be considered an inherently beneficial use.

179. To support her "tipping point" claim, Ms. Wooley-Dillon relied upon an exhibit which she independently prepared but chose not to provide to Hansen's legal counsel before the Meetings.

180. Ms. Woolley-Dillon was unable to provide any citations to any legal authorities which recognized the so-called "tipping point" doctrine she was relying upon.

181. Rebutting the "tipping point" claim, Hansen presented testimony that only two CSLRs (inclusive of the Home) were located in the City.

182. Ms. Woolley-Dillon admitted the City lacked jurisdiction to demand information about the Home which pertained to the UCC aspects of the CLUC application process as DCA has exclusive jurisdiction over CSLRs.

183. The Board's Chairman interrupted the Applicant's cross-examination of Ms. Woolley Dillon and directed the Applicant's counsel to "wrap up your questioning."

184. At a later point, the Board's Chairman chastised Hansen's counsel for placing an objection on the record, which prompted the Board's solicitor to advise the Chairman that Hansen's counsel had the right to place an objection on the record.

### The Zoning Officer

185. Over the course of the Meetings, the Zoning Officer testified concerning the Denial.

186. Contrary to Ms. Woolley-Dillon's claims, the Zoning Officer denied that he lacked sufficient information to decide whether to issue the CLUC.

187. The Zoning Officer unequivocally testified that he denied the CLUC because, in his view, the Home constituted a group family household which is not a permitted use in the R-2 Zone.

188. The Zoning Officer testified that the residents of the Home did not meet the Code's definition of a "family" in his determination.

189. The Zoning Officer denied that the use group designations in the UCC influenced his determination that the Home was a group family household even though he relied upon those UCC use group designations in the Denial.

190. Notwithstanding that City officials are required to provide reasonable accommodations to persons with disabilities, the Zoning Officer testified that (a) he had no authority to disregard the provision of the Code which prohibited group family households in the R-2 Zone; and (b) he had no obligation to review Code Section 152-1 which governs community residences.

191. The Zoning Officer admitted that if the Home was not a CSLR and had been used as a single-family home where family members were related by blood or marriage, then the City would not have required the alleged deficient materials to be submitted prior to a CLUC being issued. See infra ¶¶ 57, 79.

### The Public Testified Overwhelmingly in Support of the Application

192. The Board heard public comment on the Application during the August 26th meeting.

193. Nedal Elfar opined Hansen properly obtained a Class F license which would ensure oversight by DCA and the Home helped address the 23 million individuals who suffer from addiction.

194. Terri Burns, a Hansen employee, testified she and other staff members at the Home are available to respond to neighbor concerns on a 24/7/365 basis. Ms. Burns further expressed there is a critical shortage of sober living for women and the residents live as a "family."

195.    Chris McNickle, a local pastor, supported the Application and the Home because it assisted women in recovery. Pastor McNickle further expressed dismay that members of the public who had testified before the Board were referring to the disabled residents as "these people."

196.    Eleanor Gibbons, a resident of the Home, testified she was sixteen months sober and the residents were her "family." Ms. Gibbons explained that the residents shared responsibilities, meals, and their lives, and she was grateful to live with women with knew how to maintain recovery.  Ms. Gibbons further explained she would not be sober without the Home's family living environment and that she was attending college, worked in the City, shopped locally, and supported local charities.

197.    Vicky Hoydis testified that she was on her "deathbed" after 30 years of active addiction and "would have died in the gutter" of the City had she not been able to live in the Home. Ms. Hoydis advised the Board she had been clean for two years and was working in the treatment field while completing a Master's Program at Rutgers University. Ms. Hoydis explained the residents of the Home live as a family and they spend their money in the City.

198.    Michael Nelson, a local resident, testified he did not have any problems or concerns with the Home. He further chastised the members of the public who referred to the women in recovery as "these people," as individuals in recovery are "mothers, fathers, sons, brothers."

199.    Adam Paskow testified that he was in recovery and had benefitted greatly from sober living. He emphasized that residents of sober living homes work during the daytime and that sober living arrangements are well-suited for the City, which has a "sober community" and the requisite services and infrastructure to assist men and women in recovery.

200.    Melissa Loupos, Assistant Director of Serenity House, testified she was in recovery for over 8 years. Ms. Loupos explained the hardships endured by Ms. Hansen to establish the Home and CSLRs and her efforts were "a labor of love" and "never about the money," as some other commentators had claimed. Ms. Loupos further explained how residents are taught basic life skills such as how to make a doctor's appointment or prepare a resume. Lastly, Ms. Loupos testified the Home had been satisfactorily inspected by DCA.

201.    Amanda Guevin, a resident of the Home, testified the residents are a "family." Ms. Guvein stated she was sober because of the Home and was thankful she could be a mother to her son.

202.    Nina Del Valle, a prior resident of the Home, advised the Board, "I wouldn't be where I am today in life with my own home with my children back in my life and an active member of my society without the structure of [the Home]."

203.    Kate Langworthy testified that she needed the Home to maintain sobriety and she was thankful that the Home was located in the City, so she did not have to travel to Arizona or Florida. In response to comments raised by other members of the public who opposed the Application,

Ms. Langworthy explained that she did not come from a wealthy family and she advised the Board we are not "these people," but rather we "are people just like you."

204. Olivia Azulay testified that she had been living in the Home for approximately nine months. Ms. Azualy explained that the women in the Home are not drug addicts, but rather human beings recovering from the disease of addiction. Ms. Azulay explained the residents simply wanted a better life for themselves and that the Home makes that possible by offering support through staff and role models who show other residents how to live while in recovery. Ms. Azulay was unaware of any incidents between a resident and a Neighbor.

205. Damien Loatman described how the Home and its staff assist residents by getting them employment, helping with GEDs, resumes, and credit building. He further noted that in his experience, residents volunteer with local causes, help the underprivileged in and around the City, and maintain the Home such as by cutting the lawn.

## Public Opposition to the Application

206. Several members of the public opposed the Application and made statements claiming the Home was being operated solely for wealthy women and that the residents were transplants who did not originally reside in the City and did not benefit the City or its community.

207. Dennis Touhy testified in opposition to the Application and referred to the handicapped residents of the Home as "these people."

208. Demetrios Gusis advised the Board, "I just wanted to [say] as a city resident . . . that I oppose the variance. I'm really not looking forward to something public like that [the Home] being in my neighborhood . . .. That is it."

209. Councilman Kurtz opposed the Application and stated, "You have a group of people that are masquerading as a family, and they are not a family. They are family taking advantage of people is what is happening." See ¶99 infra.

## Board Action and the Denial of the Application

210. After public comment, the Board members posed questions to Hansen's witnesses and counsel.

211. Hansen's counsel summarized the extensive testimony which had been provided in support of the Application and asked the Board to grant a reasonable accommodation by (a) overturning the Zoning Officer's decision to deny the CLUC; (b) favorably interpreting that the Home is a permitted use as a single family detached dwelling or a community residence; and/or (c) issuing a use variance to allow the Home to be utilized as a CSLR, a group family household, or whichever zoning designation the Board decided to apply to the Home.

212. In requesting such relief, Hansen's counsel thoroughly explained why such relief was warranted based upon the record, the Code, the MLUL, and the federal and state civil rights legislation which afforded protections to the disabled residents who needed to reside in a structured setting such as the Home to ensure their continued sobriety and recovery.

213. Hansen's counsel further recounted the record evidence that the Home was indistinguishable from other single-family homes in the R-2 Zone and had no substantial negative impacts to the Zone or surrounding area.

214. Hansen's counsel explained the Code's definition of "family," which had been applied to Hansen's CLUC and during the Application, violated longstanding New Jersey Supreme Court precedent. See ¶¶ 32 – 35.

215. The Board determined by a vote of 6-1 to uphold the Zoning Officer's denial of the CLUC.

216. The Board determined by a vote of 6-1 that the Home was not a "single-family detached dwelling" under the Code and therefore was an unpermitted use in the R-2 Zone on that basis.

217. After one Board Member left the virtual hearing and over Hansen's objection, the Board determined by a vote of 6-0 that it lacked jurisdiction to interpret whether the Home is a community residence because Chapter 152 which governs community residences is not included in the Zoning Ordinance.

218. After one Board Member left the virtual hearing and over Hansen's objection, the Board determined by a vote of 6-0 to deny use variance relief to allow the residents to reside in the Home in the R-2 Zone.

219. After the Board Members announced their votes, the reasons they provided on the record were minimal, conclusory, and not grounded in the record established over the course of the Meetings.

### The Board Adopts a Memorializing Resolution

220. On October 28, 2021, the Board adopted a memorializing resolution ("Resolution"). A true and accurate copy of the Resolution is attached hereto and made a part hereof as **Exhibit Y.**

221. The Board seemingly found that the Home was an inherently beneficial use. See Resolution at ¶ 23.

222. The Resolution is devoid of any explanation as to why or how the Board determined the residents of the Home were not a "family" as that term is defined in the Code.

223. The Resolution is contradictory as the Board voted to affirm the Zoning Officer's decision to deny the CLUC because the residents of the Home were a "group family household," but the Board found the Home was "the equivalent of a boarding house." See Code Section 163-15.

224. The Resolution states in conclusory language that the Home "would conflict with the single-family zoning of the neighborhood in which it is located." See Resolution at ¶ 23. However, the Resolution is devoid of any explanation as to how or why the Board found the Home was inconsistent with or different than the surrounding "fully developed single-family homes."

225. The Board's finding that the Home "would conflict with the single-family zoning of the neighborhood in which it is located" disregards critical testimony that (a) the Home is a single-family home in a zoning district which permits single family homes; (b) the exterior of the Home is indistinguishable from other single family residences; (c) the residents live in a manner which is indistinguishable from a traditional family living environment in a single family home where the occupants are related to each other by blood or marriage; (d) the Home was consistent with the City's Master Plan which recommends housing for persons recovering from addictions without zoning district limitations; and (e) there are no detrimental effects that are unique to a CSLR that would be different from a traditional single-family home.

226. The Resolution states "[t]he neighborhood is fully developed with single-family homes that are in close proximity to each other and as such having ten persons plus support personnel would result in overcrowding and would be detrimental to the surrounding neighborhood." See Resolution at ¶ 23. However, the Resolution is devoid of any explanation as to how the Board determined there were no reasonable conditions to alleviate these alleged concerns under Sica and how the occupancy was not appropriate given the bedroom count in the Home and DCA's satisfactory inspection of the Home.

227. Conspicuously absent from the Resolution is any explanation concerning how the Board determined that Hansen's request that the Home and its residents be treated as the functional equivalent of a family residing in a single-family home was an unreasonable accommodation which would impose undue financial and administrative burdens; impose an undue hardship on the City; or fundamentally alter the R-2 Zone.

## COUNT ONE

## Fair Housing Act

228. Plaintiffs repeat the allegations contained in the foregoing paragraphs as if repeated and/or set forth at length herein.

229. Under the Fair Housing Act ("FHA"), it is unlawful to discriminate, or to otherwise make unavailable or deny, a dwelling to any buyer or renter because of a handicap of a person residing in or intending to reside in that dwelling or any person associated with that buyer or renter. 42 U.S.C. Section 3604 (f)(1).

230. Under the FHA, it is unlawful to discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection with such dwelling, because of a handicap of that person, a person residing in or intending to reside in that dwelling, or any person associated with that person. 42 U.S.C. Section 3604 (f)(2).

231.   A plaintiff may prove a violation of the FHA in one of three ways: (1) intentional discrimination; (2) disparate impact; or (3) a refusal to make reasonable accommodations. E.g. Cmty. Servs., Inc. v. Wind Gap Mun. Auth., 421 F.3d 170, 176 (3d Cir. 2005).

232.   The Home is a dwelling under the FHA and the residents are "handicapped" as women in recovery from drugs and alcohol. See 42 U.S.C. Section 3602(b), (h).

233.   The City and the Board (collectively, the "Defendants") committed intentional discrimination by denying Hansen's CLUC applications and the Application, respectively, on the basis of the residents' handicap and Hansen's intention to allow women in recovery from drugs and alcohol to reside in the Home.

234.   Defendants are using the Code, Ordinance, and the City's police powers as a pretext to exclude handicapped individuals from residing in the Home and are enforcing ordinances that have the effect of denying housing to persons in recovery from drugs and alcohol.

235.   Ms. Woolley-Dillon testified Hansen's initial CLUC application submitted in July 2019 was denied because of alleged deficiencies; however, the Zoning Officer admitted the City does not require such materials for single-family homes occupied by traditional families.

236.   Because people who are handicapped by alcoholism or drug abuse are more likely to need a living arrangement such as the one provided by the Home in which groups of unrelated individuals reside together in residential neighborhoods for mutual support during the recovery process, Defendants' application of the Code's definition of "family" has a disparate impact on handicapped individuals in recovery from drug or alcohol addiction than on others.

237.   Defendants' enforcement of the Code's provisions concerning "Group Family Households" disparately impacts individuals in recovery from an addiction to drugs or alcohol, as those individuals are more likely to require a living arrangement that falls within that definition and cannot establish such a living arrangement within the R-1 or R-2 Zones.

238.   Having denied Hansen's applications for a CLUC and the Application, Defendants have refused to make a reasonable accommodation necessary to afford current and prospective handicapped residents an equal opportunity to reside in the Home which is required to ensure they can reside in a residential neighborhood and do not fail at their recovery.

239.   Defendants' conduct, as aforesaid, violates the FHA.

## COUNT TWO

## Americans With Disabilities Act

240.   Plaintiffs repeat the allegations contained in the foregoing paragraphs as if repeated and/or set forth at length herein.

241. Section 12132 of the Americans with Disabilities Act ("ADA") constitutes a general prohibition against discrimination on the basis of disability by public entities.

242. Defendants are public entities pursuant to 42 U.S.C. Section 12131(1).

243. Current and prospective residents of the Home are qualified individuals with a disability as defined by the ADA and Hansen is associated with and provides housing to people with disabilities as defined in 42 U.S.C. Section 12102(2).

244. Because the requirements of the FHA and ADA are "essentially the same," federal courts "have concluded that the FHAA analysis can be applied to ADA "claims as well as such cases where claims are brought under [both] statutes." Yates Real Est., Inc. v. Plainfield Zoning Bd. of Adjustment, 404 F. Supp. 3d 889, 914 (D.N.J. 2019) (citing In re Lapid Ventures, LLC, 2011 WL 2429314, at *5 (D.NJ June 13, 2011)).

245. Defendants have discriminated against the handicapped residents and against Hansen because of its desire to provide housing to handicapped residents, as described herein and in Count One.

246. Defendants violated the Rehabilitation Act by refusing to provide reasonable accommodations to allow the handicapped residents to reside in the Home, which is necessary to allow the residents to reside in a residential neighborhood and to prevent them from failing at recovery.

247. Defendants' conduct, as aforesaid, violates the ADA.

## COUNT THREE

### New Jersey Law Against Discrimination

248. Plaintiffs repeat the allegations contained in the foregoing paragraphs as if repeated and/or set forth at length herein.

249. The New Jersey Law Against Discrimination ("LAD"), N.J.S.A. 10:5-1 et. seq., prohibits a "municipality, county or other local civil or political subdivision of the State of New Jersey, or an officer, employee, or agent thereof to exercise the power to regulate land use or housing in a matter that discriminates" on the basis of a disability.  N.J.S.A. 10:5-12.5.

250. Under the LAD, it is unlawful discrimination for any person to deny to or withhold from any person or group of persons any real property or a portion or portion thereof because of a disability. N.J.S.A. 10:5-12(g)(1).

251. It is unlawful discrimination for any person to aid, abet, incite, compel or coerce the doing of any of the acts forbidden by the NJLAD, or attempt to do so. N.J.S.A. 10:5-12(e).

252.   It is unlawful discrimination for any person to coerce, intimidate, threaten or interfere with any person on account of that person having aided or encouraged any other person in the exercise or enjoyment of any right granted or protected by the NJLAD. N.J.S.A. 10:5-12(d).

253.   Alcoholism qualifies as a disability under the LAD. E.g., Clowes v. Terminix Intern., Inc., 109 N.J. 575, 590 (1988).

254.   Prior addiction to controlled substances which has been remedied by rehabilitation qualifies as a disability under the LAD.  Bosshard v. Hackensack University Medical Center, 345 N.J. Super. 78, 89 (App. Div. 2001).

255.   Defendants have discriminated against the handicapped residents and against Hansen because of its desire to provide housing to the residents, as described herein and in Count One.

256.   Defendants have violated and are violating the LAD by refusing to allow the handicapped residents to reside in the Home, which is necessary to allow the residents to reside in a residential neighborhood and to prevent them from failing at recovery.

257.   Defendants' conduct, as aforesaid, violates the LAD.

## COUNT FOUR

### Section 1983

258.   Plaintiffs repeat the allegations contained in the foregoing paragraphs as if repeated and/or set forth at length herein.

259.   To state a claim for relief under 42 U.S.C. Section 1983, a plaintiff must allege, first, the violation of a right secured by the Constitution or laws of the United States and, second, that the alleged deprivation was committed or caused by a person acting under color of state law. See West v. Atkins, 487 U.S. 42, 48 (1988).

260.   Under color of State Law, Defendants improperly enacted and have applied the Code and Ordinance to effectuate discrimination and deny Hansen from using the Home to assist women in recovery from drugs and alcohol, as described herein.

261.   Defendants' illegal and improper actions are not roughly proportionate to the public good sought to be achieved and are grossly disproportionate to any asserted public interest because they unduly deprive Hansen and the handicapped residents of their constitutional rights far beyond what is reasonable, legal or necessary.

262.   Defendants' actions are illegal because they prevent, frustrate, and impede the right to use and enjoy the Home and their conduct is arbitrary, capricious, unreasonable, malicious, discriminatory and in bad faith, and shocks the conscience.

263.   Defendants' actions, as aforesaid, violate 42 U.S.C. Section 1983.

## COUNT FIVE

### New Jersey Municipal Land Use Law

264.   Plaintiffs repeat the allegations contained in the foregoing paragraphs as if repeated and/or set forth at length herein.

265.   A land use board's decision on an application shall be reduced to writing and include findings of fact and conclusions based thereon. Further, a board shall provide its findings and conclusions through a written memorializing resolution. N.J.S.A. 40:55D-10(g)(1) – (2).

266.   A land use board's action will be reversed if it unsupported by the record or is so arbitrary, capricious, or unreasonable as to amount to an abuse of discretion. Smart SMR of New York, Inc. v. Borough of Fair Lawn Bd. of Adjustment, 152 N.J. 309, 327 (1998).

267.   The Board's denial of the Application was wrong as a matter of law; the Board palpably abused its discretion and acted in an arbitrary and capricious manner. See ¶¶ 220 - 227 infra.

268.   Defendants denied Hansen's CLUC applications and the Applications by applying definitions in the Code which conflict with longstanding New Jersey Supreme Court precedent.

269.   The Board is a quasi-judicial body charged with providing applicants with a fair and impartial hearing on matters before it, and whose function is to apply the facts presented at the hearing to the legal requirements. In contravention of those obligations, the Board drew on inappropriate and illegal considerations and ignored the evidence that the residents of the Home reside together as the functional equivalent of a family and that the Home is necessary to afford the residents an opportunity to reside in a residential neighborhood and to ensure they do not fail at recovery.

270.   The Board wrongfully and unlawfully denied the Application in violation of the MLUL.

## RELIEF SOUGHT AS TO ALL COUNTS

**WHEREFORE**, Plaintiffs prays that this Court award them the following relief:

(1) Enter a declaratory judgment that Defendants have engaged in discrimination prohibited by the Fair Housing Act, Americans with Disabilities Act, and the New Jersey Law Against Discrimination.

(2) Enter a declaratory judgment that the Code's definitions of "family" and "group family household" violate the New Jersey Constitution and are null and void.

(3) Enter a declaratory judgment that the Code's requirement that "group family households" be located in zones other than the R-1 and R-2 Zones is arbitrary and capricious.

(4) Enter preliminary and permanent injunctions directing the issuance of a certificate of land use compliance to the Home and any other approvals, such as a use variance, which are necessary for the Home to be utilized by Hansen as a cooperative sober living residence.

(5) Enter preliminary and permanent injunctions restraining the City of Atlantic City and its officers, employees, agents, attorneys and successors, and all persons acting in concert or participating with any of them, from interfering in any way with Hansen's use of the Home as a sober living residence for individuals in recovery.

(6) Award Plaintiffs compensatory and punitive damages.

(7) Award Plaintiffs costs and reasonable attorney fees.

(8) Such other and further relief as the Court may deem equitable and just.

## JURY DEMAND

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiffs hereby demand trial by jury in this action of all issues so triable.

Respectfully submitted,

**/s/*Keith A. Davis***
Keith A. Davis
NEHMAD DAVIS & GOLDSTEIN, P.C.
4030 Ocean Heights Avenue
Egg Harbor Township, NJ 08234
kdavis@ndglegal.com
Telephone: 609.927.1177
Facsimile: 609.926.9721

**/s/*Christopher S. D'Esposito***
Christopher S. D'Esposito
NEHMAD DAVIS & GOLDSTEIN, P.C.
4030 Ocean Heights Avenue
Egg Harbor Township, NJ 08234
cdesposito@ndglegal.com
Telephone: 609.927.1177
Facsimile: 609.926.9721
COUNSEL FOR PLAINTIFF

## INITIAL CERTIFICATION PURSUANT TO LOCAL CIVIL RULE 11.2

Pursuant to L. Civ. R. 11.2, Plaintiffs certify that the matter in controversy in this case is the subject of two pending actions: (1) Hansen's New Jersey Law Against Discrimination claim against the City is pending in the Superior Court of New Jersey under Docket Number ATL-L-2559-19; (2) the City issued a Special Complaint (SC-2019-062658) to Hansen House, LLC for failing to obtain an occupancy permit. That matter is pending in the Atlantic City Municipal Court.

*/s/ Keith A. Davis*
Keith A. Davis, Esquire


*/s/ Christopher S. D'Esposito*
Christopher S. D'Esposito, Esquire

## <u>VERIFICATION</u>

1.      Jennifer Hansen, of full age, hereby certify as follows:

2.      I am the founder and President of The Hansen Foundation, Inc. and Hansen House, LLC, Plaintiffs in this action and I am an authorized representative of the Plaintiffs.

3.      I have read the foregoing Verified Complaint.  It is based upon my personal knowledge and upon documents and information supplied by others.  As to information based upon my personal knowledge, the facts contained therein are true to the best of my knowledge.

4. I declare under penalty of perjury that the foregoing is true and correct.

Dated:  December 7, 2021

_____

JENNIFER HANSEN